# COMMERCIAL INVESTMENT COMPANY OF PORTO RICO

*v.*

# MAYAGUEZ LIGHT & POWER COMPANY.

Mayaguez Equity, No. 201.

1. The legislature of Porto Rico, in the exercise of its police powers of legislation, may regulate the manufacture and sale of ice, etc., but this must be done subject to strict regard for property rights, and with reference to the respect due to courts having property *in custodia legis.*

2. A municipal health office, acting under the authority of local statutes and regulations and instructions from the superior board of health, cannot directly interfere with the manufacture and sale of ice by a receiver of a court.

3. The health office should apply to the court for an order against its receiver, and failure to do so, followed by interference with such re-

Commercial Invest. Co. v. Mayaguez L. & P. Co.

ceiver, is contempt of court, and may be punished as such. And that punishment may properly be that he pay the costs of the contempt proceeding, and a reasonable fee to the attorney of the relator.

Opinion filed August 22, 1908.

*Mr. N. B. K. Pettingill,* attorney for receiver.

*Mr. Jorge V. Dominguez* and *E. Lloreda,* attorneys for Dr. Gonzalez Martinez.

RODEY, Judge, delivered the following opinion:

The issue before us is on a rule against the respondent to show cause why he should not be punished as for a contempt of court for an alleged wrongful interference with property in the hands of a receiver. The facts out of which the matter arises are about as follows:

In the latter part of March, 1908, the Commercial Investment Company of Porto Rico filed its bill of complaint against the Mayaguez Light & Power Company, praying for the foreclosure of a mortgage which the former held upon the electric light and ice plants of the latter in said Mayaguez. On proper application, and a showing therefor, F. L. Cornwell was appointed receiver pending the foreclosure, and he immediately qualified, took possession of all the property, and proceeded to act in the premises. A proper order in that behalf was made, and all persons were commanded to turn over to him all of the property of the respondent corporation, and all persons were enjoined from interfering with him in any manner in his conduct of the business of said concern as is usual pending the foreclosure.

In order to maintain the business as a going concern, in addition to running the electric light plant, it became necessary that the receiver should continue the manufacture of ice, and its sale and distribution in the city of Mayaguez, the same as the plant had theretofore been doing. However, either because the machinery was not in order, or for some other cause, the ice plant portion of the property in question remained idle until about the 1st of August, 1908, when the receiver caused the same to be started, having first made a contract with a certain firm named Remotti & Koppisch, in the city of Mayaguez, for the delivery to them of a certain large quantity of ice daily, which they immediately proceeded to distribute and sell on their own account. The respondent Dr. Isaac Gonzalez Martinez is the local health officer at Mayaguez, acting under the superior board of health of the island, at San Juan. On the morning of August 4th, 1908, some three or four days after the ice plant in question had started up and begun to distribute ice, he was driving through the streets, and saw some of it in the wagons both of the plant itself and of these distributers. Seeing, as he claims, that some of it was opaque, he concluded it was impure, and condemned certain portions of it. Then he went to the plant, and there condemned some more; then he condemned twelve or fourteen blocks from the wagons, and brought them in the city building, so as to take samples from them, which he did, and finally, the next day sent a block of the ice, with two or three sealed bottles of water obtained from melted portions of it, to headquarters at San Juan for analysis. He claims that he called upon the receiver of the ice plant to witness the taking and preparation of these samples, but that the latter refused to attend. Then he caused a policeman, or several of

.them, to go around to many people who had purchased the ice, and condemned portions of it in their possession. He did this during the whole of the 4th and 5th of August. He claims that he had no knowledge that the plant was in the hands of a receiver, but admits that, after he had condemned some of the ice, the receiver himself told him of that fact, and Mr. Remotti, one of the contractors for the distribution of the ice, testified that he was present when the receiver so informed the respondent. There was a good deal of evidence introduced, going to show that there was considerable feeling and bad temper manifested by one of those distributers of the ice, and perhaps, to some extent, even by the receiver, on the one side, and the respondent health officer, on the other, and there was also evidence tending to show that the respondent health officer went around over the city, condemning the ice, both on the streets and at the plant, carrying a revolver with him, and, further, it was testified to, although he partially denies it, that respondent said, when notified that the property was in the hands of a receiver of this court, that he, respondent, did not care if it was, that the superior board of health was above the power of the court, and that he would do as he pleased, and that he was not subject to any orders but those of his superior officers in the board of health.

The receiver, on the 6th of August, filed a petition for an order to show cause, which was duly verified, and supported it by about a dozen affidavits of as many different persons. It set forth that the ice thus condemned was nice, clear, crystal ice, manufactured from distilled water by the best known processes, and that it was as pure as ice can be, when properly so manufactured, and that respondent condemned it without first having

Commercial Invest. Co. v. Mayaguez L. & P. Co.

had any analysis of it made. These affidavits further set forth in great detail, and the proofs tended more or less in the same direction, that the respondent was not, in truth and in fact, actuated by any commendable desire to preserve the health of the community where he was thus acting as health officer, but was, in fact, acting from an unworthy motive of personal spite against the receiver, and against the contractors who were distributing the ice; and, further, that his actions were intentionally in the interest of a rival plant, with which some of the respondent's friends were connected, and which latter plant, owing to an accident to the machinery, had been shut down for a day or two previously, and the business of which was being secured by the plant in question in the interim, and that respondent's efforts were intended to thwart the efforts of the receiver to secure this new business, and to aid the other plant in saving it. Further, that the action of respondent was also in fact due to personal pique and spite against the plant in question and its receiver, because he, respondent, had made a long, favorable scientific report some six months previously regarding it, when the quality of the ice had been questioned, and in which report he, respondent, had reported against the presence of bacteria in the ice, etc.; and that he was now trying to injure the plant because he had not been paid by the then proprietors for his services for making such report. That respondent was further moved to his wrongful acts because, after the plant had been put in the hands of a receiver, the former attempted to attach some of the funds due to it from one of its debtors, to secure compensation for his said previous favorable report on the ice, which attachment the receiver prevented by securing a proper order of this court for its dismissal; and that, for this reason,

said health officer was venting his spite on the concern, now that he found himself vested with seeming power to do so.

It was further alleged in these affidavits, and the proofs, to some little extent, moved in the same trend, that, in addition, respondent was moved to this wrongful action for political reasons and motives. That political feeling in the district of Mayaguez was very high, and that, because the plant in question and its distributers were of the opposite political party from respondent, and the plant belonging to the opposition concern was in the hands of his political partisans and friends, he was endeavoring to aid them in this way, etc. There was much in the affidavits that ordinarily would have been impertinent, but, on the whole, there was such a strong prima facie case made, going to show a probable gross contempt, as that, on the 6th of August, the court issued its order against respondent, ordering him to show cause, as aforesaid. It may be mentioned here, that, on the 5th of August, respondent went before a local court, and swore to a complaint against the receiver, and later to another complaint against several of his men who were in charge of the plant, pretending to do this under the orders of the superior board of health, and in accordance with local statutes and regulations.

Shortly after first condemning the ice on August the 4th, respondent wired an account of his action to the superior board of health at San Juan, and in his dispatches included some of the particulars as to why he condemned the ice, stating that he did it because it was opaque, etc. Numerous telegrams passed between respondent and the board of health about the matter during the few days following. This board of health, as we gather from the dispatches in evidence, ordered him to

Commercial Invest. Co. v. Mayaguez L. & P. Co.

condemn any ice not fit for consumption, etc., and further ordered him to proceed under certain sections of the local health laws and regulations, as stated. It is not certain whether the superior board of health at San Juan understood that the plant in question was in the actual custody of a receiver of this court, although the word "sindico" was used by respondent in the Spanish communications to them. In all, respondent, by himself and the policeman who acted as his agent, condemned about 3,000 pounds of ice during the days they were engaged in the work. It was also in evidence that the fact they had so condemned the ice reduced its sale from nine or ten thousand pounds per day, to less than five thousand pounds per day, and thus unquestionably damaged the business.

On the morning of August the 10th, respondent came into court in person, to answer, and was also represented by counsel. In addition, the local fiscal, or district attorney, of the Mayaguez portion of the island, appeared in the proceedings in his behalf. A three days' trial was had on the issues raised by the response, and a good deal of evidence was taken on both sides of the question. We gave this long time to the matter because of the evident excitement it created in the community, and with a view to ascertaining the real facts.

In the opening paragraph of his answer, the respondent, in the usual phraseology, attempts to purge himself of any contempt against the orders of the court and of the charge of having had any intention of being guilty in that behalf, but, further on, he proceeds to justify his acts, and to claim that, in any event, the receiver of this court is as much subject to the local health laws as anybody else, and that the distributers of the ice are not in fact officers of the court, and that condemning the ice which they were distributing is not a contempt, etc.

IV. PORTO RICO—18.

Commercial Invest. Co. v. Mayaguez L. & P. Co.

Then his response proceeds to set out the sections of the local law and regulations under which he claims to have proceeded, and which he contends fully authorize his action. He filed all the telegrams he had received from the superior board of health, and which he claims ordered him to thus proceed, and which he also claims justify his acts in that behalf. Further, he denies that any of the persons who filed affidavits against him have any knowledge of a scientific character as to the purity of ice, etc., and endeavors to discredit their testimony for that reason, and asserts that the portions of the ice which he did condemn were in fact impure and unfit for consumption, and that the condition of the plant where it is manufactured is not sanitary, etc. Then he proceeds to deny all allegations referring to alleged malice, or his purpose to ruin the plant, or to discredit its product, and to deny that he was, in any way, connected with the opposing plant, or had any desire to favor it in any way, and proceeds to characterize such charge as an insult gratuitously put upon him, etc. Further, he denies that he had any intention whatever to prejudice or damage the persons in question, or the interests of the firm of distributers, and characterized the allegations regarding the political matters as childish, and denies ever having exhibited any revolver while performing his duty, or spreading any false reports about the plant or its product, and insists that he has an undeniable legal right to enter the plant in question, to examine any of the ice manufactured there, and intended to be distributed and sold to the people, and asserts that, in all his doings in the premises, he acted in the best of faith, under orders of the superior board of health, and with good motives. Then he denies that any of the acts complained of constitute a contempt of court in any manner

whatsoever, and, by inference, demurs to every one of the allegations in the petition for the order.

From the mass of evidence introduced a strange situation confronts us. On the one hand, the sample of water from the melted ice sent by respondent to the superior board of health at San Juan (it seems they did not analyze the ice), according to the certificate which was presented, was said to contain some 298 parts in the million of chlorin. On the other hand, the chemist of the government agricultural experiment station here at Mayaguez went to the plant, and, after securing samples, analyzed the water used to make the ice, and finds it perfectly pure; in fact, his certificate shows it to be purer than the distilled water he uses in his own laboratory. His analysis of the ice from two samples taken apparently at random from the tanks where the ice is made, shows it to be first class in every respect, and, on the average, better than such ice generally is in the plants in the different states of the Union,—the melted water from it containing only about 5 grammes of chlorin per million parts. This chemist's statement was that the water out of which the ice is made, and the ice itself, is unquestionably of first-class quality, the water containing little or no organic matter, and that, if made without contamination, as is intended to be and ought to be, it cannot result otherwise than in being pure. Now, on the facts last above stated, one of two things must be true; either the receiver's employees did not make the ice which the health officer condemned out of the pure distilled water provided by the machinery of the plant, or the health officer himself polluted it before he sent it to San Juan for analysis, or that perhaps it became contaminated in the wagons, on the streets, or on the way, or even in the labora-

tory at San Juan, which latter seems next to impossible, as the water was put into sealed bottles for transmission. An independent and evidently fair-minded mechanical engineer, who said he had considerable experience with ice plants, examined the plant in question, and pronounced it first-class, and stated that, if the ice is made as it is intended to be made in that plant, it cannot result otherwise than in being pure and wholesome. Another mechanical engineer of many years' experience in the manufacture of ice in the United States, and now at the Guanica central sugar plant, testified quite as positively in the same line. More than a dozen witnesses testified that, generally speaking, the ice as made and sold from the plant in question is pure and crystalline. One or two local restaurant keepers testified that the ice which was condemned on the days in question was partly opaque, and one, at least, testified that it had specks of carbon or something of the sort in it,—that is, the portion that was condemned, which was a very small part of the quantity such restaurant keeper had on hand at the time. The chemist from the experiment station showed that chlorin, even in considerable quantities, is not necessarily injurious to health, and further showed that it was utterly impossible for any to be in any of the ice manufactured at that plant in such quantity as 298 parts to the million, unless there was a leak from the baths into the ice moulds.

The process of making ice at this plant is the usual one of taking the steam from the boilers or from the cylinders of the engine, carrying it into a condenser, then filtering the water thus obtained, then letting it run into settling tanks, then skimming and filtering it again, and finally letting it run into the large tank from which it is conveyed through a hose into the

moulds or tanks that are immersed in the freezing baths where it is frozen into blocks of ice.

The man in charge of the plant under the receiver, filed first a long affidavit, and then testified orally, that, previous to starting up the plant on the 1st of August, he caused every one of the 172 tanks or moulds to be washed out clean, and that he never permitted any water to be frozen into ice save this distilled water, or water condensed from steam and duly skimmed, settled, and filtered, as stated, and that the entire product of the plant always has been, and is, clear and crystalline, save that (and he states this is the case in almost every plant), because of the air getting into the water, it often collects in the center of the block of ice and sometimes gives to the center of a portion of the block a silvery appearance, as the air is not all forced out before the freezing. That the ice is just as wholesome as any he has ever seen, and that he was, for a considerable time, engaged in the manufacture of ice before he came to Porto Rico.

The court itself has for many years seen ice manufactured in such a plant, and knows how it appears when frozen in the moulds. It has examined the ice in question, and it is, to all appearances, first-class in every way, as such ice goes. The proceeding here being one to ascertain whether or not a contempt has been committed, we regard it as being a proceeding for the conscience of the court itself, and that neither the relator nor the respondent have any such rights as would ordinarily constrain the court to confine itself to the actual evidence before it; therefore the court felt that it had the right to do so, and took a quiet walk around town and saw the ice from the opposition plant in the ice boxes of several restaurants and other places to whom it had been sold, and we do not hesitate to assert in this

regard, that the ice from the plant in question is superior to that which the court saw as coming from the other plant.

Now it may be that the workmen, unknown to the man in charge of the plant in question, did not clean all of the tanks or moulds when this plant was started up on August 1st, and may have lazily omitted to do so, or may have permitted leaks from the bath to exist in one or more of them, which latter fact the receiver denies, because he states the plant is only two years old, and that the moulds are perfectly sound. Or the workmen may have permitted the ordinary water from the city hydrants, which they use for other purposes in the establishment, to fill or partially fill some of the moulds, and may even have done so through neglect or laziness; and that the health officer happened to get hold of a sample of such ice, and sent it to San Juan. This throws doubt upon the issue of fact, because the court itself has evidence before it, which, coupled with its own ocular evidence and knowledge of such things, shows it that the plant in question produces as good and wholesome a quality of ice as is reasonably to be expected, and that is practically as good as is furnished to the people of any community in the United States.

The court itself has recently examined this plant, and caused a few additional precautions against contamination of the distilled water to be taken, so the plant is therefore at present even a little safer from any contamination than it was at the time in question.

As intimated, the proceedings appear to have created not a little excitement and interest in the community, and some of the newspapers of the island, printed in Spanish, have editorially assumed a rather peculiar attitude of questioning the right of

Commercial Invest. Co. v. Mayaguez L. & P. Co.

the court to take any proceedings in the matter at all. The court, of course, has no object save to enforce proper respect for its orders, and to prevent interference with its process and with the persons it places in charge of property that is properly *in custodia legis*. It is, of course, just as much the duty of a court of justice as it possibly can be of any executive officer, to keep its own officers from violating any proper law, whether the same be local or national. A court has just as much interest in the preservation of the health of the community as any health officer or board of health can possibly have; but, at the same time, all persons, whether belonging to the executive department of the government or not, must respect the custody of property by the court through its own officers. The position cannot be tolerated that a health officer can, except, perhaps, in cases of the gravest immediate danger to public health, where the court would itself approve the action, and punish its own receiver for his criminal act, be permitted to officiously interfere with the court's officers, or with the latter's possession of property held under order of the court. We might state here, for the benefit of all concerned, including the editors referred to, that this statement applies as well when property is in the custody of an insular court as when it is in possession of the Federal court, which, owing to the diversity of citizenship of the parties, happens to have jurisdiction here. There is always a proper and polite remedy whenever executive officers find it necessary to interfere with property *in custodia legis,* and that is to make proper and respectful application to the court itself, which undoubtedly would have been the mode of procedure here had the health officer or the superior board of health requested the advice of the local fiscal or of the attorney general of the island, when the court would, of course,

at once have caused an investigation to be made that would have been satisfactory, and all cause of friction would have been removed. The rule we are here stating is fully sustained by the opinions of the Chief Justice of the United States in the case of Re Tyler, 149 U. S. 182, 183, 37 L. ed. 695, 13 Sup. Ct. Rep. 785, and in the case of Re Swan, 150 U. S. 652, 37 L. ed. 1211, 14 Sup. Ct. Rep. 225. Let us quote a portion of the language of the latter opinion as it appears on page 652: "The possession of property by the judicial department, whether Federal or state, cannot be arbitrarily encroached upon without violating the fundamental principle which requires coördinate departments to refrain from interference with the independence of each other . . . and the position that a petty officer can take property from the possession of a court without permission and without warrant, upon his own motion, and without instructions from any other person, as petitioner admits he did, because, in his view, the duty is imposed upon him by a particular statute, and that the court is without power to pass upon the questions involved, or, if it does so, that its judgment may be treated with contemptuous defiance, is utterly inadmissible in any community assuming to be governed by law."

It is unquestioned that the insular legislative assembly of Porto Rico, under the organic act, the same as any state legislative assembly, can, in the proper exercise of its police powers, enact proper laws for the preservation of the public health, and the prevention of injurious adulterations of food, water supply, etc., and can vest the executive officers of the island, under proper regulations, with power to enforce the same; but all of this must be done with strict regard to property rights and due process of law generally, as well as with reference to the respect due the courts as to property they may have in their custody.

This doctrine is fully sustained by the Supreme Court of the United States in New York ex rel. Lieberman v. Van De Carr, 199 U. S. 557, 50 L. ed. 308, 26 Sup. Ct. Rep. 144, where a full review of the police power of states in this regard is set forth in the opinion by Mr. Justice Day.

The authorities above cited upon the two points involved cover the law of the case as to those points. After a full consideration of all the facts and circumstances surrounding the whole matter, we are of opinion and we find that the respondent health officer here was mistaken in his theory that opaque ice, when the opacity results simply from the presence of bubbles of air in the center of the block, is necessarily unwholesome. We are further of opinion that he was not entirely actuated by good, disinterested motives in the condemnation of the ice in question, but we are also of opinion that our own receiver failed to properly advise or impress respondent with the consequences of his proposed action, and that the contractors, or one of them, were guilty of tantalizing him into carrying his condemnation proceedings much further than there was any necessity for. The tone of respondent's answer does not, in our opinion, comport with a respectful desire to purge himself of contempt, and his action in causing the arrest, or, at least, in filing complaints against officers of this court, under the circumstances surrounding this case, cannot be passed over without rebuke. However, notwithstanding all this, and notwithstanding the strenuous effort made by counsel for relator for the imposition of a heavy fine to reimburse the plant for the loss and damage to its business, or a proper term of imprisonment against respondent, we are satisfied, from an interview we have had with the local fiscal, that respondent's unwarranted action occurred largely through

his ignorance of the respect due the orders and process of courts, and because of his failure to consult the law officers of the executive department of the insular government before proceeding.

Further, we do not see that any good purpose would be served by imposing such a heavy fine or a term of imprisonment as is requested; and while we think the contempt committed is more than technical, under all the circumstances the sentence of the court will be that respondent Dr. Isaac Gonzalez Martinez be, and he hereby is, held to be guilty of a contempt of the orders and process of this court, and that he pay all the costs of these contempt proceedings, to be taxed by the clerk, and a fee of $100 for counsel for the receiver, and that he stand committed until the same is paid. Should any recurrence of the acts complained of take place, it will then be proper to impose such a fine or such a term of imprisonment as will put an end to such proceedings. The court has, it thinks, a proper appreciation of conditions on the island, and of the lessons yet to be learned by the inhabitants under the changed system of government.

It will be seen that, were we following the usual rule in this sort of a case, the sentence should ordinarily make the relator whole for any damages sustained. See Wells, F. & Co. v. Oregon R. & Nav. Co. 9 Sawy. 601, 19 Fed. 20; Matthews v. Spangenberg, 15 Fed. 813; Fischer v. Hayes, 19 Blatchf. 13, 6 Fed. 63. In the latter case a fine of over $1,300 was imposed after an accounting had been taken to ascertain the proper amount. That attorneys' fees should also be a part of the costs, see Stahl v. Ertel, 62 Fed. 920; and that the arrest of a receiver is a particularly offensive contempt, see United States v. Murphy, 44 Fed. 39. In this latter case it was held that such arrest was a contempt even though the ordinance under which the receiver was acting when arrested was void.

Commercial Invest. Co. v. Mayaguez L. & P. Co.

Nothing in this opinion is intended to deny the right of, or prevent, the superior board of health or the said health officer from, at any time in the future, entering the plant in question at any reasonable hour to examine the ice there manufactured, or prevent them examining the ice being sold and distributed to the public, or from taking samples thereof in a reasonable manner; and the receiver is ordered to afford all proper facilities to that end; but all complaints as to the receiver's actions in this behalf must be made by direct application to the court itself, when proper steps will be taken to correct any wrong that may be found to exist, even to the extent of punishing or removing the receiver, or both.